UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | |
|---|---|
| MELISSA EVANS, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No.: 15:19-cv-523 |
| NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY and DIVISION OF ADULT CORRECTIONS AND JUVENILE JUSTICE, | ) Jury Trial Demanded |
| Defendant. | ) |

NOW COMES PLAINTIFF, MELISSA EVANS, by and through undersigned counsel, and complains against Defendants the NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY ("DPS") and the DIVISION OF ADULT CORRECTIONS AND JUVENILE JUSTICE ("DAC") (collectively "Defendants"), as follows:

**INTRODUCTION AND NATURE OF THE CASE**

Plaintiff brings this action against Defendants seeking damages and attorneys' fees resulting from Defendants' unlawful violation of the Equal Pay Act, 29 U.S.C. § 206(d), which is a part of the Fair Labor Standards Act ("FLSA").

**JURISDICTION AND VENUE**

1. This Court has original subject matter jurisdiction over this action pursuant to 29 U.S.C. § 206(d) of the FLSA and 28 U.S.C. § 1331, as the claim for relief asserted herein arises under a federal statute.

2. This Court has personal jurisdiction over Defendants because they operate within the State of North Carolina and within this District.

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

**PARTIES**

4. Plaintiff, Melissa Evans, is a citizen and resident of Columbus County, North Carolina. At all relevant times, Ms. Evans was an employee of Defendants within the meaning of 29 U.S.C. § 203(e). She worked for Defendants at Columbus Correctional Institute ("Columbus Correctional" or the "Facility") from September 4, 1990 until her retirement on April 30, 2019.

5. Plaintiff has standing to bring this action pursuant to 29 U.S.C. § 216(b).

6. Defendant DPS is an agency of the State of North Carolina, established and empowered by N.C. Gen. Stat. §§ 143B-600, *et seq*.

7. Defendant DAC is a departmental subsidiary of Defendant DPS, established and empowered by N.C. Gen. Stat. §§ 143B-630, *et seq*.

8. Defendants are responsible for the care, custody and supervision of inmates who are serving prison sentences following their convictions. In carrying out this responsibility, Defendants maintain, staff and operate approximately fifty-six (56) correctional institutions across the State of North Carolina, including Columbus Correctional where Plaintiff was employed for nearly thirty (30) years.

9. At all relevant times, Defendants were public agencies and employers within the meaning of 29 U.S.C. § 203(d).

10. The State of North Carolina and its public agencies have waived sovereign immunity for the purpose of the FLSA. *See* N.C. Gen. Stat. § 143-300.35 (a)(1). Accordingly, Defendants do not enjoy immunity for Plaintiff's FLSA claims and therefore, may be sued under

the Act. *See also*, e.g. *Blackmon v. Cohen*, No. 1-17CV890, 2018 WL 2451246 (M.D.N.C. May 31, 2018).

11. At all relevant times, Defendants were an enterprise within the meaning of 29 U.S.C. § 203(r).

12. At all relevant times, Defendants were an enterprise engaged in commerce or in the production of goods for commerce within the meaning of 29 U.S.C. § 203(s)(1)(c).

## FACTUAL ALLEGATIONS

13. Mrs. Evans was hired by the Defendants as a Correctional Officer at Columbus Correctional on September 4, 1990. Columbus Correctional is a medium-security facility housing up to 698 adult male inmates.

14. Mrs. Evans was promoted to Correctional Sergeant on May 1, 1994 and to Correctional Lieutenant on May 1, 1995. Mrs. Evans was promoted to Correctional Captain on January 4, 2004 at a salary of $34,727. She held her position as a Captain until her retirement on April 30, 2019. Her salary at the time she retired (after working for Defendants for nearly 30 years) was $51,333.

15. Jimmy Hilbourn, a white male, was hired as a Correctional Officer at Columbus Correctional on September 3, 1991. He was subsequently promoted to Correctional Sergeant on January 1, 1995 and Correctional Lieutenant on December 1, 2007.

16. Mr. Hilbourn was promoted to Correctional Captain on March 5, 2012 with a salary of $42,952. Though Mrs. Evans had been a Correctional Captain for over eight (8) years, her salary in March 2012 was $41,237. Mr. Hilbourn's salary remained greater than Mrs. Evans' salary for the next seven (7) years, until she retired from Defendants' employ.

3

17. Each of Mr. Hilbourn's promotions occurred after Mrs. Evans was promoted to same position. At the time of Mrs. Evans' retirement, Mr. Hilbourn's salary was $53,375, while her salary was $51,333.

18. At all relevant times, Michael Duncan, a white male, was also employed by Defendants at Columbus Correctional. He was hired on September 3, 1991 as a Correctional Officer. He was subsequently promoted to Correctional Sergeant on November 1, 2004 and to Correctional Lieutenant on May 14, 2012.

19. On January 1, 2016, the North Carolina Office of State Human Resources ("OSHR") implemented a new employee classification system as part of the Statewide Compensation System Project. As part of the Project, new classification titles and pay plan/grades were established.

20. Pursuant to the new policy, Mrs. Evans was classified as a Correctional Captain I on January 1, 2016. She was relocated up to a Correctional Captain II on September 1, 2016. Ms. Evans did not receive a pay increase when she was reclassified as a Correctional Captain II.

21. Mr. Hilbourn was also classified as a Correctional Captain I on January 1, 2016 and then relocated up to Correctional Captain II on September 1, 2016. Mr. Hilbourn's salary was greater than Mrs. Evans salary when they were reclassified as Correctional Captain IIs, yet he still received a pay increase of $1,408.

22. Pursuant to the new policy, Mr. Duncan was classified as a Correctional Lieutenant I on January 1, 2016 and relocated up to a Correctional Lieutenant II on September 1, 2016. Persons classified as a Correctional Lieutenant II typically reported to Correctional Captain IIs.

23. On September 1, 2016 (after working as a Correctional Lieutenant for approximately four (4) years and recently reclassified as a Correctional Lieutenant II), Mr.

Duncan's salary was $45,574. On the same date, Mrs. Evans salary (after working as a Correctional Captain for over twelve (12) years and recently reclassified as a Correctional Captain II) was $45,461. Though Mr. Duncan was a lower classified employee and reported to Correctional Captain II, his salary was greater than Mrs. Evans.

24. Mr. Duncan was promoted directly to Correctional Captain II (the position held by Mrs. Evans since September 1, 2016, though prior to the implementation of the classification system, she had been a Correctional Captain since 2004) on July 24, 2017 at a salary of $51,231. At the time Mr. Duncan was promoted to Correctional Captain II, Mrs. Evans salary in the same position was $47,461.

25. Each of Mr. Duncan's promotions occurred after Mrs. Evans was promoted to same position. At the time of Mrs. Evans' retirement, Mr. Duncan's salary was $55,411, while her salary was $51,333.

26. Correctional Captain IIs are involved in the planning, supervision and coordination of activities in medium-custody institutions and supervise Correctional Lieutenant IIs. Correctional Captain IIs also serve as shift supervisions and/or the Officer in Charge ("OIC") of the facility and are responsible for all inmates and on-duty personnel, among other duties. A true and accurate copy of the North Carolina Office of State Human Resources Employee Classification Specs for Correctional Captain II is attached hereto as **Exhibit A**.

27. In addition to their duties as Correctional Captain IIs, all Captains at Columbus Correctional are given an individual job assignment.

28. Mrs. Evans was assigned as the Safety Officer of Columbus Correctional[1]. As Safety Officer, Mrs. Evans was responsible for every aspect of safety at Columbus Correctional, which included, among other duties:

 i. Reviewing all the Facility's injury reports and submitting them to Assistant Superintendent Walsh;

 ii. Completing a monthly Safety Report, which required her to review all Safety Committee[2] reports, Tool Control reports and Kitchen Equipment reports;

 iii. Ensuring all maintenance requests were submitted, and if not, she would send the maintenance request;

 iv. Conducting quarterly Safety Committee meetings;

 v. Overseeing the Facility's yearly safety inspection conducted by Defendant DPS's Safety Inspector. The inspection typically lasted two (2) days and included a thorough inspection of all Facility areas, as well as a review of all Safety Reports. In preparation for the yearly safety inspection, Mrs. Evans made sure all the Facility's paperwork was in order and all Facility areas were in proper condition;

 vi. Overseeing the yearly inspection by the Columbus County Fire Department, which involved a walk- thru of the Facility and sewing plant (located on the grounds where inmates could work); and

---

[1] Jennifer Walsh, a Correctional Assistant Superintendent III at Columbus Correctional, delegated her role as Safety Officer to Mrs. Evans.

[2] The Safety Committee is made up of approximately eighteen (18) Captains and Lieutenants at Columbus Correctional. Each member of the Safety Committee is assigned an area of the Columbus Correctional campus which they were required to inspect and, if damaged (broken tile, plumbing or electrical issue, etc.), they must complete a report and submit it to Mrs. Evans.

6

vii. Completing the Tier II reports for submission to DPS's Emergency Management Division and Columbus County Emergency Management. The report required an accounting of all flammable chemicals on the premises.

29. At all times relevant, Mr. Hilbourn was assigned to lead the Security Threat Group ("STG"). STG was responsible for monitoring the inmates with regards to potential gang involvement. The group was comprised of Mr. Hilbourn and two other staff members and was responsible for monitoring inmates clothing for gang insignia. STG was also responsible for meeting inmates as they transferred into the Facility in order to inventory their property and inspect any tattoos for an indication of gang affiliation. Typically, the staff members performed these tasks and would report their findings to Mr. Hilbourn. Mr. Hilbourn was responsible for filing a monthly STG report to the Assistant Superintendent.

30. At all times relevant, Mr. Duncan's job assignment was Tool Control. He was required to oversee the numbering all tools on the Facility's premises and compile tool reports for the kitchen, maintenance and sewing plant. Mr. Duncan submitted a monthly tool report to Mrs. Evans.

31. Defendants do not provide salary increases based on merit[3] or seniority.

32. On July 27, 2018, Mrs. Evans filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging violations of the EPA and Title VII. A true and accurate copy of the Charge of Discrimination is attached hereto as **Exhibit B** and incorporated herein by reference.

33. In its Position Statement dated October 2, 2018, Defendants stated "[i]t is admitted that Ms. Evans performs equal work to that of Mr. Duncan and Mr. Hilbourn under similar working

---

[3] Defendants eliminated merit-based salary increases in 1990.

conditions…." A true and accurate copy of Defendants' Position Statement is attached hereto as **Exhibit C** and incorporated herein by reference.

34. The EEOC issued Mrs. Evans a Dismissal and Notice of Right to Sue ("Right to Sue Letter") on August 21, 2019. A true and accurate copy of the Right to Sue Letter is attached hereto as **Exhibit D** and incorporated herein by reference

35. Mrs. Evans commenced this action within ninety (90) days of the issuance and receipt of the Right to Sue Letter.

## CLAIM FOR RELIEF
## VIOLATION OF THE EQUAL PAY ACT
## [29 U.S.C § 206(d)]

36. Plaintiff reiterates and realleges each and every paragraph above as if set forth fully herein.

37. Defendants paid Mr. Hilbourn a higher salary than Mrs. Evans from March 25, 2012 (the date he was promoted to Correctional Captain) through her retirement on April 30, 2019, approximately seven (7) years. In March 2012, Mrs. Evans had been a Correctional Captain for over eight (8) years, however her male colleague, Mr. Hilbourn, was paid a greater salary immediately upon his promotion to Captain.

38. From September 1, 2016 until July 1, 2017, Defendants also paid Mr. Duncan a greater salary than Mrs. Evans. During this time, Mrs. Evans was a Correctional Captain II, while Mr. Duncan was still a Correctional Lieutenant II (a lower ranking employee classification which reported to Correctional Captain IIs, such as Mrs. Evans).

39. On July 24, 2017, Mr. Duncan was promoted directly to Correctional Captain II with a salary of $51,231, which was $3,770 greater than Mrs. Evans' salary (though Mrs. Evans

8

had been a Captain for thirteen (13) years and a Correctional Captain II for nearly a year). When Mrs. Evans' retired on April 30, 2019, Mr. Duncan's salary was $4,078 greater than hers.

40. As Correctional Captains IIs, Mrs. Evans, Mr. Hilbourn and Mr. Duncan performed a common core of primary duties, including but not limited to providing on the job-training to other employees, assigning and supervising custodial staff, coordinating administrative affairs within the Facility and daily management of off-site activities when inmates work in the community. *See* Exhibit A.

41. OSHR's Class Specifications for the job of Correctional Captain II lists the Knowledge, Skills and Abilities required for the Correctional Captain II position. *Id.* Because Mrs. Evans, Mr. Hilbourn and Mr. Duncan were each Correctional Captain IIs, they had equal skills necessary to perform the duties associated with the position.

42. The only variation in job duties among Mrs. Evans, Mr. Hilbourn and Mr. Duncan were their individual job assignments. Each job assignment required them to focus on a specific aspect of the Facility's operation. At all times relevant, Mrs. Evans was the Facility's Safety Officer; Mr. Hilbourn oversaw potential gang activity with the assistance of two other Facility employees; and Mr. Duncan oversaw the Facility's tools.

43. Though she was paid less than her male counterparts, Mrs. Evans' position as the Facility's Safety Officer required at least equal, if not more time, effort and responsibility than either job held by Mr. Hilbourn or Mr. Duncan.

44. Though Mr. Hilbourn was head of STG, it was his two assigned assistants that completed most of the group's duties. Mr. Hilbourn did not regularly inventory new inmates' property or inspect tattoos. Rather, his assigned staff assistants would perform this work and report

back to him. Mr. Hilbourn was responsible for filing a single monthly report with an Assistant Superintendent.

45. Mr. Duncan was assigned to Tool Control, which required him to oversee the numbering all tools on the Facility's grounds, compile monthly reports from the kitchen, maintenance and the sewing plant which accounted for all of the Facility's tools, and provide a tool report directly to Mrs. Evans. Unless a tool was missing or broken, Mr. Duncan's Tool Control position required very little work outside of preparing the monthly report.

46. As described in Paragraph 28 above, as Safety Officer at Columbus Correctional, Mrs. Evans 1) prepared the Facility for and oversaw numerous yearly safety inspections, 2) reviewed all injury reports regarding injuries at the Facility, 3) completed a monthly Safety Report, which required her to compile and review approximately 18 reports prepared by other Facility employees, 4) conducted quarterly Safety Committee meetings, and 5) reviewed monthly reports submitted by Safety Committee members and 6) confirmed that maintenance requests were submitted and properly completed.

47. Mrs. Evans' position as Safety Officer took greater time and effort and carried more responsibility than the positions assigned to Mr. Hilbourn or Mr. Duncan. In order to prepare for the Facility's various inspections, Mrs. Evans would begin preparing and reviewing paperwork at least a month prior to the inspection. If a deficiency was found during an inspection, Mrs. Evans was responsible for correcting it. Neither Mr. Hilbourn nor Mr. Duncan were responsible for the preparation and execution of regular inspections.

48. Neither Mr. Hilbourn nor Mr. Duncan were responsible for coordinating and conducting any type of Facility meeting. However, Mrs. Evans coordinated and conducted quarterly Safety Committee meetings. She was also responsible for collecting and reviewing the

monthly reports from all eighteen (18) Safety Committee members and combining them (and other reports she received) into her monthly Safety Report. Mrs. Evans spent approximately three (3) hours per month reviewing each member's safety report. However, Mrs. Evans frequently did not receive all the reports, which required her to track down the missing reports or she would inspect the area and complete the paperwork herself.

49. Mrs. Evans, Mr. Hilbourn and Mr. Duncan performed their work under similar working conditions. They worked in the same surroundings, i.e. Columbus Correctional and were exposed to the same job hazards, i.e. the custody, control and supervisions of inmates in the medium-security correctional facility for adult males.

50. By failing to pay Mrs. Evans equal wages for the equal (and arguably more) work she performed as compared to her male colleagues, Defendants willfully and intentionally violated the EPA.

51. As direct and proximate result of Defendants' unlawful conduct, Mrs. Evans is entitled to recover her compensatory damages, liquidated damages, and attorneys' fees and costs incurred in connection with this claim.

## JURY DEMAND

Plaintiff demands a trial by jury of the claim asserted in this Complaint.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays the Court:

1. For a judgement in her favor for all monetary damages, compensatory damages and liquidated damages recoverable by Plaintiff against Defendants, jointly and severally, where appropriate;

2. For a judgment in Plaintiff's favor, determining that Defendants' actions and conduct relating to Plaintiffs' wages violated the EPA;

3. For an award of reasonable attorneys' fees and costs incurred by Plaintiff in filing and prosecuting this action;

4. For an award of pre- and post-judgment interest to Plaintiff on all damages; and

5. For all other, further relief as this Court deems just and appropriate.

This the 18th day of November, 2019.

Respectfully submitted,

 /s/ Dawn T. Mistretta
Dawn T. Mistretta
N.C. Bar No. 31691
Lindsey A. Bullard
N.C. Bar No. 46664
STRAUCH GREEN & MISTRETTA, P.C.
911 Paverstone Drive, Suite F
Raleigh, NC 27615
Telephone: (919) 278-7453
Facsimile: (855) 876-8893
dmistretta@sgandm.com
lbullard@sgandm.com
*Counsel for Plaintiff*